(644 P.2d 1368)
No. 53,275

In the Matter of the Guardianship and Conservatorship of MARTHA LAKE.

Petition for review denied July 21, 1982.

Opinion filed May 20, 1982.

*James E. Sanders* and *Lowell C. Paul,* of Legal Aid Society of Topeka, Inc., for the appellant.

*Douglas R. Sell* and *Clyde M. Burns,* of Burns & Burns, P.A., of Lyndon, for the appellee.

Before FOTH, C.J., SPENCER and PARKS, JJ.

PARKS, J.: This is an appeal from the denial of a motion to change guardian and conservator brought by the ward's husband and next friend Henry Lake.

The ward, Martha Lake, is a mentally disabled adult who has been under a guardianship and conservatorship since 1975. Originally, Ida Mae Edmonds served as Martha's guardian and conservator while she lived in Blue Mound, Kansas. In the summer of 1976, Martha moved to Osage City to live with her sister, Eleanor Anstaett, who was then appointed as guardian and conservator for Martha. The record indicates that this change in guardian was the result of a stipulation and that Ida Mae Edmonds was not removed as guardian for any cause or misconduct.

While still living in Blue Mound, Martha Lake obtained a divorce from her husband Henry. They had been married for approximately sixteen years and had two children, Roy and Mary, who are also mentally disabled. The children are now adults and Eleanor Anstaett also serves as their guardian and conservator. After Martha moved to Osage City, she reconciled with Henry and the two were remarried in 1979. Henry Lake is not an incapacitated person, although Eleanor is the representative payee for receipt of his social security check.

Eleanor and Martha's relationship has deteriorated since Eleanor's appointment as guardian and conservator, leading Martha and Henry to seek the assistance of various social agencies. For example, Helen Miller, director of the Osage County Senior Center, testified that Eleanor frequently ridiculed and criticized Martha in the presence of other persons. She further testified that Henry and Martha Lake approached her concerning their distrust of Eleanor and their fear that she was using their money to purchase food and grocery items for her personal use, while they were receiving inadequate food and clothing. They also advised Ms. Miller that they were frightened of Eleanor due to her threats to institutionalize Martha if they complained about their treatment. Similar complaints were received by Ida Mae Edmonds and by Jean Jackson, the director of the shelter workshop and training program attended by Roy and Mary Lake. A referral was made to the Department of Social and Rehabilitation Services in Ottawa, Kansas and an investigation was initiated by Mr. Joe Wakefield. Although Mr. Wakefield testified that the problems were not resolved, no further action was taken after Eleanor cancelled a meeting between herself, the Lakes, and Mr. Wakefield. Shortly after being contacted by SRS, Eleanor had Martha's telephone disconnected.

Bad feelings were also fostered between the ward and guardian by the persistence of a debt owed Henry by Eleanor. Shortly after Henry and Martha reconciled, Eleanor borrowed $900 from Henry to repair her car. No note was given, no interest was paid on this unsecured loan, and no repayment plan was established. Moreover, as of the final hearing on the motion to change guardian Eleanor had repaid only $60 in cash and agreed to repay the balance in installments of $100 per month by purchasing appliances for Henry and Martha. Henry also testified that Eleanor had

borrowed an additional $400 from him for use by her son. Eleanor disputed this allegation but did testify that Henry and Martha have no other savings and an income of only $357 per month in social security benefits.

In early February 1981, Martha and Henry Lake moved back to Blue Mound, an hour-and-a-half drive from Osage City. As of March 31, Eleanor had not visited the Lakes' new residence, had made no plans for dealing with medical emergencies and intended to continue her duties as guardian and conservator of Martha from her home in Osage City. Martha testified that she wanted Ida Mae Edmonds to be her guardian and Ms. Edmonds, a Blue Mound resident, was willing to be reappointed.

The district court found that Eleanor had made proper accountings of all her financial dealings on behalf of Martha and had given no cause to compel her removal. The district judge also stated that while he found the loan of $900 to Eleanor "shocking" in light of her fiduciary relationship with Henry, that the financial dealings between Henry and Eleanor did not bear on the issue of Eleanor's ability to serve as Martha's guardian and conservator. Finally, the court expressed doubt that a change of guardians would ultimately satisfy Martha and held that it was not in her best interest to remove Eleanor in favor of another guardian and conservator.

There is no specific statutory authority concerning the removal and replacement of a guardian or conservator in K.S.A. 59-3001 *et seq.,* but K.S.A. 59-1711 provides general authority for the removal of a fiduciary. This provision applies to all estates and in *In re Estate of Osborn,* 179 Kan. 365, 371, 295 P.2d 615 (1956), the court noted that it may be applied to guardianship proceedings. Thus, a guardian may be removed at the discretion of the court whenever he becomes incapable of performing the duties of his trust or whenever he fails or refuses to perform his lawful duties. In sum, a guardian may be removed for good and sufficient cause and the best interests of the ward may constitute such good cause. *Osborn,* 179 Kan. 365, Syl. ¶ 4.

The discretionary decision of the court to make a change of guardian is much like a decision regarding the custody of a child since both are subject to a number of countervailing circumstances. In both instances, the best interests of a person legally incapable of exercising his own judgment concerning his best

interests must be determined. However, unlike a custody action in which parental rights must be considered, the guardianship of an incapacitated adult is solely concerned with the rights and interests of the ward. This is not to say that to determine the best interests of the ward the court need only follow the wishes of the ward, but neither may the court look only to the sufficiency of the guardian's accounting. Rather, the court must weigh and examine the overall relationship of the guardian and ward, the desires of the ward in light of the severity of his particular incapacitating condition, the adequacy of the guardian's past financial records and decisions, and the availability of a fit and proper person willing to be substituted as guardian and conservator.

Here, the court concluded that Martha's best interests did not favor a change of guardian. However, the trial court did not consider the evidence bearing on Martha's distrust of her guardian or the availability of a person who lives in the same community and who is ready, willing and apparently able to serve as Martha's guardian and conservator. More importantly, the court refused to consider the significance of the $900 debt to Henry as bearing on the guardian's relationship with her ward. The loan, which obviously encompassed all of Henry's reserves, was the type of self-dealing traditionally prohibited to fiduciaries and, as noted, struck the trial court as "shocking." We think the guardian's demonstrated willingness to breach her fiduciary duty, although to another cestui, had a bearing on her fitness to serve as a fiduciary to Martha. Further, although there was no evidence that the loan hampered Henry's ability to fulfill the legal obligation of support he owed his spouse (*Chipp v. Murray,* 191 Kan. 73, 76, 379 P.2d 297 [1963]), Martha's financial security is clearly tied to that of her husband. Henry and Martha operate as one financial unit and any diminution in Henry's assets or savings will ultimately affect Martha. Since Eleanor handled all financial transactions for both Henry and Martha, she was well aware of the financial interdependence and meager resources of the Lakes. Thus, the breach of the fiduciary duty owed Henry cannot be viewed in isolation but must also bear on the viability of the guardian/ward relationship between Eleanor and Martha. The argument that Henry was competent to dispose of the money in any number of ways and that thus no harm came to Martha, begs

the question of whether Eleanor can continue to effectively serve in a trust relationship with Martha.

We conclude that the trial court abused its discretion in failing to consider the actions of the guardian as fiduciary to Henry and the evidence of distrust by the ward. Therefore, the judgment is reversed and the case remanded with directions to remove the guardian and conservator and to appoint some proper person as successor guardian and conservator.