No. 101,153

SOUTHWESTERN BELL TELEPHONE CO. d/b/a AT&T KANSAS, *Appellee*, v. BEACHNER CONSTRUCTION COMPANY, INC., *Appellant*.

(221 P.3d 588)

Opinion filed December 11, 2009.

*Richard L. Hines*, of Hines & Ahlquist, P.A., of Erie, argued the cause and was on the briefs for the appellant.

*Mimi B. MacDonald*, argued the cause, and *James T. Lorenzetti*, of Robert A. Kumin, P.C., of Mission, was on the brief for the appellee.

*Molly Aspan*, of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., of Tulsa, Oklahoma, was on the brief for *amicus curiae* MCI Communications Services, Inc.

*William A. Larson,* of Larson & Blumreich, Chartered, of Topeka, was on the brief for *amicus curiae* Kansas Contractors Association.

The opinion of the court was delivered by

NUSS, J.: This is a property damage case arising out of a public improvements project in Frontenac, Kansas. Southwestern Bell Telephone Company d/b/a AT&T Kansas (SBT) obtained judgment against Beachner Construction Company, Inc. (Beachner) for damages negligently caused to an SBT underground telephone cable which SBT had relocated at the city's request to accommodate Beachner's project construction. We transferred Beachner's appeal to this court pursuant to K.S.A. 20-3018(c).

The issue on appeal, and this court's holding, is as follows:

Did the district court err in holding that SBT's only duty was to relocate the cable "to avoid any conflicts" with Beachner's completed construction? Yes.

Accordingly, we reverse the district court and remand.

## FACTS

The Kansas Department of Transportation (KDOT) submitted to interested contractors the specifications for a project involving McKay Street in Frontenac, Kansas. Defendant Beachner Construction Company, Inc., (Beachner) submitted a bid price in reliance upon the plans and specifications and was awarded the contract. The project required Beachner to tear out and widen McKay Street, to install a storm sewer, new curb, gutter, and inlets, and then to repave the street. KDOT and Beachner ultimately signed a contract for the project.

The KDOT construction plans required the storm sewer to be installed at specified underground locations at a depth of 4 feet 11 inches sloping downward to 5 feet 1 inch for drainage. According to Beachner, the construction plans required the actual depth of the sewer to deviate no more than 2 inches from the depth provided in the plans.

SBT had an underground telephone cable located in the same public right-of-way where the sewer was to be trenched and laid. Prior to construction, KDOT notified SBT of the upcoming project

and instructed SBT to move the cable in accordance with the project plans and specifications. SBT was provided a copy of the plans.

David Ghram was in charge of the cable relocation for SBT. He testified on cross-examination about his understanding of the relocation standards:

"[ATTORNEY]: Okay. And basically what they [KDOT] indicate to you is Southwestern Bell, here are the plans and specifications, you move your line to comply with ensuring that you don't violate those plans and specifications, isn't that the requirements?
"[GHRAM]: That sounds correct.
"[ATTORNEY]: Okay. And if they say we are putting a storm sewer in and these are—and this is the location, this is the depth, we want you to move your lines so it doesn't interfere with that, isn't that, in fact, what they indicate to you or to your engineers?
"[GHRAM]: That would be correct.
"[ATTORNEY]: Okay. And your engineers, based on KDOT's plans and specifications for the project on your behalf, they being your agent, draw up plans and specifications for Southwestern Bell on what they think should be done?
"[GHRAM]: That would be correct.
"[ATTORNEY]: Okay. So it is not—these plans are not KDOT's plans, it is the plans that your agent has done for you on what they think they should do?
"[GHRAM]: That is correct."

Ghram testified that he was able to point out the location of the proposed sewer line on the plans drawn up by SBT's engineers for the cable relocation. He further testified that based upon KDOT specifications and SBT's resultant engineering plan, the SBT cable was to be relocated at a minimum depth of 36 inches, unless otherwise noted. SBT's engineers and its contractor, Radell Construction Company, relocated the cable outside of the public right-of-way and the area where the sewer line was to be built, except for two locations.

First, the cable remained within the public right-of-way at the eastern location but was lowered to a depth of 10 feet in accordance with SBT's engineering plans. This depth was approximately 5 to 6 feet below Beachner's subsequent trench and was not damaged by Beachner during construction. When Ghram was effectively asked whether SBT engineers could only avoid the storm sewer at

this eastern location by drafting plans to bury the cable at 10 feet, he replied, "That sounds correct."

Second, at the western location, SBT abandoned an older portion of cable and instead installed new cable. While SBT was able to place the majority of the new cable outside the right-of-way, a 30-foot "jog" of cable was simply relocated within the right-of-way, at a depth of 3 feet, to avoid conflict with an adjacent private landowner's circle drive. A portion of this jog was the part damaged during construction by Beachner.

KDOT held a preconstruction conference between state and city officials involved in the project, and utility companies were invited to attend. The purpose of the conference was to discuss issues involved with the project, including traffic concerns and utility conflicts. When Radell Construction Company attended the preconstruction conference on SBT's behalf, its cable relocation for SBT was already complete.

Before Beachner began construction, it called the Kansas One Call notification center pursuant to K.S.A. 66-1801 *et seq.* SBT was notified of the call. Both parties agree that SBT then accurately marked with orange paint the "tolerance zone" of its cable at the east and west locations where Beachner would be operating. The tolerance zone is a lateral marking of a 24-inch area in all directions from where the cable is located underground. K.S.A. 66-1802(p). The marking does not provide information regarding the depth of the cable.

Ron Vyhlidal (Vyhlidal), Beachner's construction foreman on the project, saw the SBT tolerance zone markings at the east and west locations. He testified he knew that Beachner would be digging within both zones during construction, *i.e.*, according to the plans, the cable was in the area where the sewer trench was to be dug and the line was to be laid. Prior to any digging, Vyhlidal asked SBT's Ghram about the depth of SBT's cable at the east location. Ghram replied that the cable at the east location was 9 or 10 feet deep. Vyhlidal did not ask Ghram about the depth of SBT's cable at the west end of the project. After receiving this information, Beachner began sewer line construction at the east end of the

project and progressed west. Beachner excavated 7 feet deep in SBT's eastern tolerance zone and did not encounter the cable.

When Beachner reached the west end tolerance zone, Vyhlidal knew that the SBT cable was underneath the paint marking and that the construction project would cross the cable. Vyhlidal testified that when the depth of a utility is unknown, the standard procedure is to use a backhoe to excavate 18 inches and then dig by hand to expose the cable. However, he knew that SBT was to have received the construction plans which provided that utility companies were scheduled to relocate their utilities prior to the construction to avoid any conflicts. He therefore assumed that the west end of the cable was located at the same depth, 9 to 10 feet, as the east end because "that's the way it jogged out into our excavation." Accordingly, Beachner used a backhoe to trench 6 feet deep. The backhoe, which had a 30-inch-wide bucket, "just nicked" the side of SBT's 3 to 3½-foot-deep cable on the extreme southern boundary of the trench. Vyhlidal estimated that the alternative of hand digging to this depth would have taken 1 hour.

SBT filed suit to recover the cable repair cost. After a bench trial, the district court determined the duty and fault of each party. The court determined that Beachner breached the statutorily imposed duty to exercise reasonable care by failing to ascertain the depth of SBT's cable prior to excavation with a backhoe. See K.S.A. 66-1809(a) (Upon receiving information from the utility of the tolerance zone of the underground utilities, "an excavator shall exercise such reasonable care as may be necessary for the protection of any underground facility in and near the construction area when working in close proximity to any such underground facility."). It also determined that SBT breached no duty. It found Beachner 100% at fault and awarded full damages of $4,365.13 to SBT.

## ANALYSIS

*Issue: The district court erred in holding that SBT's duty in relocating its cable was solely to avoid any conflicts after completion of construction.*

### The district court decision

The district court determined that SBT was required only "to relocate its cable 'to avoid any conflicts' because of K.S.A. 17-

1902(1)." The court further determined that this phrase, which came solely from the KDOT plans, only required SBT to avoid any conflicts with the city's sewer line after completion of its construction.

The district court began by quoting the KDOT construction plans, which do not appear in the record on appeal:

" 'Utility Companies located within the City's right-of-way have been furnished with construction plans. Utility Companies are scheduled to relocate their utilities prior to the roadway construction to *avoid any conflicts*. The Contractor is responsible to have utilities located prior to construction to avoid damage. The Contractor will be required to work around the existing utilities within the right-of-way, which do not conflict with the proposed construction.' " (Emphasis added.)

The court proceeded with its analysis by observing that the plans required SBT "to relocate [its] utilities prior to the roadway construction to avoid any conflicts." The court then noted that the contractor, Beachner, "is responsible to have utilities located prior to construction to avoid damage." The court heavily emphasized this latter obligation and treated it as essentially superseding SBT's obligation "to avoid any conflicts" by strictly limiting SBT's obligation to those conflicts occurring *after* construction. It expressly rejected the proposition that SBT was required "to relocate its cable to avoid any conflict with the excavation necessary to construct the sewer line."

Because the sewer line eventually was to be buried at a depth (5 to 6 feet) below the cable (approximately 3 feet), the district court found no postconstruction conflict. The court effectively determined that Beachner could have worked around the shallow SBT cable when trenching 2 to 3 feet beneath it for the sewer installation. Accordingly, the court held that SBT did not breach its duty.

*Beachner's position*

Beachner contends the district court improperly substituted the construction plans' requirement for SBT "to avoid any conflicts" for SBT's duty imposed by K.S.A. 17-1902(1). Subsection (1) generally provides that at the request of the city, the utility must re-

move or relocate its cable "in order to accomplish construction . . . activities." Beachner further claims that SBT breached this statutory duty. When SBT placed its western section of cable within the right-of-way, it should have dug deeper than the 5 to 6 feet that the construction plans required Beachner to bury the sewer line there. In the alternative, Beachner argues that SBT should have avoided interference with Beachner's required construction in that location by burying all of its cable completely outside of the work area—regardless of depth.

*SBT's position*

SBT essentially responds that the district court was correct in both defining SBT's obligation as "avoiding any conflicts" only after completion of construction and also in holding that SBT met this obligation. It argues that the evidence is undisputed that its cable did not conflict with the sewer line as constructed: "[a]t the point of damage, the sewer line was buried at a depth of 6 feet, and Plaintiff's cable was buried at a depth of 3 to 4 feet." From this information SBT argues that "[t]he sewer line simply needed to go below Plaintiff's cable."

SBT also argues in the alternative. It contends that if the district court should have applied K.S.A. 17-1902(l) instead, SBT nevertheless met this statutory obligation as well.

"The evidence concerning whether Plaintiff's cable prevented the Defendant from 'accomplishing construction' of the storm sewer, as this phrase is used in K.S.A. 17-1902(l) was conflicting, although the weight of the evidence showed that the Defendant could have installed the sewer without hitting Plaintiff's cable."

As more fully discussed below, we agree with Beachner: The duty properly imposed upon SBT arises from K.S.A. 17-1902.

*Discussion*

When, as here, a city plans to repair or maintain a public right-of-way, it can require a provider such as SBT to adjust or remove its facilities to permit the city's activity. K.S.A. 17-1902(l) provides:

"If requested by a city, *in order to accomplish construction and maintenance activities directly related to improvements for the health, safety and welfare of the public, a provider shall promptly remove its facilities from the public right-of-way*

*or shall relocate or adjust its facilities within the public right-of-way* at no cost to the political subdivision. Such relocation or adjustment shall be completed as soon as reasonably possible within the time set forth in any request by the city for such relocation or adjustment. Any damages suffered by the city or its contractors as a result of such provider's failure to timely relocate or adjust its facilities shall be borne by such provider." (Emphasis added.)

Beachner argues that the italicized language imposes a duty of care on SBT. More specifically, because the street project was an improvement for the public, SBT was obligated to remove, relocate, or adjust its facilities, *i.e.*, cable, to the extent necessary for Beachner to accomplish its construction goals of installing the sewer line. Beachner essentially contends that SBT's actions needed to be reasonable if Beachner were to accomplish its goals.

We independently observe that because SBT admits that it was "furnished with construction plans" before construction began, the district court's ruling effectively authorized SBT to relocate its cable to a place which it knew, or should have known, could interfere with Beachner's future actions to install the sewer line. These actions included, *inter alia*, digging the trench, fitting and laying the pipe, and refilling the trench. The only prohibition was the physical interference of SBT's relocated cable with the subsequently completed sewer line, *e.g.*, the cable could not block the sewer line.

Our standard of review when interpreting statutes is well settled. Interpretation of a statute is a question of law, and our review is unlimited. *Genesis Health Club, Inc. v. City of Wichita*, 285 Kan. 1021, Syl. ¶ 2, 181 P.3d 549 (2008). In reviewing a statute, the "fundamental rule to which all other rules are subordinate is that the intent of the legislature governs if that intent can be ascertained." *Steffes v. City of Lawrence*, 284 Kan. 380, Syl. ¶ 2, 160 P.3d 843 (2007). " 'As a general rule, statutes are construed to avoid unreasonable results. There is a presumption that the legislature does not intend to enact useless or meaningless legislation.' " *Hawley v. Kansas Dept. of Agriculture*, 281 Kan. 603, 631, 132 P.3d 870 (2006) (quoting *In re M.R.*, 272 Kan. 1335, 1342, 38 P.3d 694 [2002]).

With these principles in mind, we hold that the district court erred in substituting "avoiding any conflicts" for SBT's statutory

obligation: K.S.A. 17-1902(l). We further hold that for subsection (l) to have any real meaning, a duty of reasonable care must be imposed upon the provider like SBT when removing, relocating, or adjusting its facilities at the request of the city "in order to accomplish construction . . . activities." *Cf. Hawley*, 281 Kan. at 631. Accordingly, SBT's duty is not limited solely to the timeliness of its actions. See, *e.g.*, 17-1902(l) ("a provider shall promptly remove its facilities from the public right-of-way or shall relocate or adjust its facilities within the public right of way").

When, as here, we have sought the meaning of a specific statutory subsection, we have also often looked to the broader statute for guidance. "[V]arious provisions of an act in pari materia must be construed together in an effort to reconcile the provisions so as to make them consistent, harmonious and sensible." *State v. Gaudina*, 284 Kan. 354, 358, 160 P.3d 854 (2007).

We addressed an analogous situation in *Brown v. State*, 278 Kan. 481, 484-85, 101 P.3d 1201 (2004). Consistent with these principles, we determined that K.S.A. 22-4506(b) implicitly requires appointed counsel in postconviction matters to have a minimum level of competence despite the absence of such language in the statute. In making this determination, we looked to the broader purpose of the statute and to others, *e.g.*, 22-4522(e)(4) (State Board of Indigents' Defense Services "shall . . . adopt rules and regulations . . . for the guidance of appointed counsel . . . including . . . qualifications, standards, and guidelines for . . . appointed counsel"). We concluded that "[w]hen counsel is appointed by the court in postconviction matters, the appointment should not be a useless formality." *Brown*, 278 Kan. at 484. We have similarly looked to the purpose behind a statute, as well as other statutory provisions, when interpreting a specific section. See *State v. Breedlove*, 285 Kan. 1006, 179 P.3d 1115 (2008) (reading various subsections of K.S.A. 38-1681 together to reinforce the court's holding on a specific subsection).

Interpreting the provider's obligation in subsection (l)—to remove, relocate or adjust facilities "in order to accomplish construction . . . activities"—as including a duty of reasonable care is also

entirely in harmony with several other subparagraphs in K.S.A. 17-1902 as set forth below.

We observe that subparagraph (b) gives SBT the right to construct, maintain, and operate appurtenances and facilities along, across, upon, and under any public right of way. But it also provides that SBT's "facilities shall be so constructed and maintained *as not to obstruct or hinder the usual travel or public safety on such public ways or obstruct the legal use by other utilities.* " (Emphasis added.)

We next observe that subparagraph (d) establishes the overall superior authority of the city over SBT in such matters:

"The authority of a provider to use and occupy the public right-of-way shall always be subject and subordinate to the reasonable public health, safety, and welfare requirements and regulations of the city."

Subparagraph (k) is more explicit and addresses the possibility of damage caused by SBT and the city's rights to recover:

"A city may require a provider to repair all damage to a public right-of-way caused by the activities of that provider, or of any agent affiliate, employee, or subcontractor of that provider, while occupying, installing, repairing, or maintaining facilities in a public right-of-way and to return the right-of-way, to its functional equivalence before the damage pursuant to the reasonable requirements and specifications of the city."

Subparagraph (k) goes on to address the city's rights in the event SBT would not repair all damages that it caused:

"If the provider fails to make the repairs required by the city, the city may effect those repairs and charge the provider the cost of those repairs. If a city incurs damages as a result of a violation of this subsection, then the city shall have a cause of action against a provider for violation of this subsection, and may recover its damages, including reasonable attorney fees, if the provider is found liable by a court of competent jurisdiction."

We further observe that subparagraph (n) grants the city additional authority to protect itself from the provider by assessing certain fees for the provider's use and occupancy of the public right-of-way:

"(3) *inspection fees* to recover all reasonable costs associated with city inspection of the work of the provider in the right-of-way.

(4) . . . *costs associated with repairing and restoring* the public right-of-way because of damage caused by the provider . . . in the right-of-way; and

"(5) *a performance bond*, in a form acceptable to the city, . . . *insuring appropriate* and timely *performance* in the construction and maintenance of facilities located in the public right-of-way." (Emphasis added.)

Lastly, subparagraph (q) specifically protects the city, through indemnification and hold harmless provisions, from the provider's negligent conduct:

"Providers shall indemnify and hold the city . . . harmless against any and all claims . . . of harm for which recovery of damages is sought, to the extent that it is found by a court of competent jurisdiction to be *caused by the negligence of the provider . . . , while installing, repairing or maintaining facilities in a public right-of-way.*" (Emphasis added.)

We acknowledge that (q) also provides that "[t]his section is solely for the benefit of the city and provider, and does not create or grant any rights, contractual or otherwise, to any other person or entity." Even assuming, without deciding, that its reach expansively prevents Beachner from relying upon it to identify a duty owed to Beachner by SBT, it nevertheless shows that the legislature knows how to clearly express such a "limitation." The legislature did not do so in the other subsections to K.S.A. 17-1902 discussed earlier in this opinion, *e.g.*, subsection (l). Indeed, subsection (l) expressly states that providers will bear "[a]ny damages suffered by the city *or its contractors* as a result of such provider's failure." (Emphasis added.)

Simply put, K.S.A. 17-1902 expressly recognizes the duty of care owed by a provider working in the public right-of-way. See, *e.g.*, subsection (q) and the provider's required indemnification of the city for the harm caused by the provider's negligence. The statute also impliedly recognizes the provider's duty of reasonable care. For example, what would otherwise be the purpose of city inspections of the provider's work as authorized by subsection (n)(3)? And what would be the purpose behind a performance bond guaranteeing to the city "appropriate" performance in the provider's construction and maintenance of its facilities as authorized by subsection (n)(5)? Although admittedly there is no express statutory statement that the provider must use reasonable care in choosing a location for the removed/relocated utility, that obligation is implicit.

We contrast the situation in the instant case with one in which a party simply desires to dig in an area where a utility line may be buried, *i.e.*, where there is no need to move the utility line at the city's request. The digging party is obligated to first call One Call to be informed of the line location. See K.S.A. 66-1805. Because the utility has no need to move its line in such a situation, only to mark its tolerance zone, that digging party generally has the sole obligation to proceed with reasonable care. See K.S.A. 66-1809.

However, when, as here, a city has ordered a provider to move its utility line "in order to accomplish construction" of the city's sewer line by a contractor, the duty of reasonable care cannot rest entirely upon the contractor. This conclusion is particularly valid when, as here, the utility has been given an advance copy of the construction plans. The advance copy is presumably to help the utility plan the movement of its line to a location where the line will not interfere with the contractor's performance of its contractual construction obligations. In short, it simply makes no sense for SBT to be allowed to relocate its cable to a place which it knows, or should have known, is in Beachner's planned "construction path"—so long as the cable will not be in conflict with the completed sewer line. In the testimony of SBT's agent in charge of the cable relocation, David Ghram, he essentially agreed.

In conclusion, we hold that when a provider is requested by a city under K.S.A. 17-1902(l) to remove, relocate, or adjust its facilities "in order to accomplish construction . . . activities directly related to improvements for the health, safety and welfare of the public," the provider's duty implicitly contains an obligation to use reasonable care. This obligation includes the specific need to avoid interfering with the construction plans to be executed by the contractor. Accordingly, the district court erred as a matter of law in essentially overriding SBT's statutory duty by limiting SBT's obligation to simply avoid conflicts occurring after construction.

We now turn to SBT's alternative argument: that its obligation under K.S.A. 17-1902(l), if any, was met. SBT first generally contends that it met its statutory obligation "to relocate its underground cable as necessary to accommodate the storm sewer" because it buried its cable at 3 feet, and the sewer line was to be

buried at 5 to 6 feet. SBT's counsel contended at oral arguments that while SBT alone could determine the depth in which to bury its newly placed cable, its engineers were nevertheless required to follow "reasonable" engineering standards in the process. According to SBT, its engineers followed reasonable standards because "[t]here was no physical conflict between the cable and the sewer line."

SBT next generally contends that it met its statutory obligation because if Beachner would have properly located the cable by hand digging before backhoeing, there would have been no damage to the cable.

"[T]he evidence was that the Defendant knew that the cable was positioned beneath the locate marks, yet did nothing to ascertain the cable's depth before digging with its backhoe. Just like every other excavator, the Defendant had the ability to hand dig or otherwise expose the cable to make sure that it would not hit the cable while digging to the required depth for the storm sewer."

SBT argues that although the evidence was conflicting, "the weight of the evidence favored a finding that the location of Plaintiff's cable did not . . . prevent the Defendant from 'accomplishing construction' of the sewer line." Because Beachner "could have installed the sewer without hitting the cable," SBT contends it did not breach its duty, was not negligent, and was not at fault.

We observe that because the district court relied upon an erroneous legal conclusion, it focused on the wrong groups of facts. Consequently, it made no relevant findings of fact that we can examine for substantial competent evidence, *i.e.*, to which we can apply our deferential standard of review. Nevertheless, SBT essentially asks us to review the record and determine de novo that the preponderance of the evidence supports its position: that SBT did not breach its duty, that Beachner did breach its duty, and that Beachner was wholly at fault. Determining breaches of duty and degrees of fault based upon the entire record are not functions typically performed by an appellate court. See, *e.g.*, *Deal v. Bowman*, 286 Kan. 853, 859, 188 P.3d 941 (2008) ("[i]n the vast majority of cases, the question of negligence is a factual determination for the jury, not a legal question for the court"; whether duty has been breached is a question of fact); PIK Civ. 4th 105.01, 105.05;

*State v. Sharp*, 289 Kan. 72, 80, 210 P.3d 590 (2009) (an appellate court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence). We decline the invitation now.

Even if we were inclined to attempt making these determinations, we are handicapped, if not prevented, by the state of the record on appeal. None of the 10 exhibits admitted at trial are included. There are no photographs and no construction plans or drawings by KDOT or SBT. There are no documents marked by the witnesses to otherwise show the respective locations of the city right-of-way, SBT's cable (complete with jog), Beachner's trench, and precisely where the backhoe struck the cable. Even the best speculations by counsel at oral arguments cannot overcome inadequacies in the appellate record. The responsibility for providing a record on appeal sufficient to support a party's argument belongs to that party: here, SBT. See *Kenyon v. Kansas Power & Light Co.*, 17 Kan. App. 2d 205, 206, 836 P.2d 1193 (1992) ("It is well-settled that the burden is on a party to designate a record sufficient to present its points to the appellate court and to establish its claims.").

Accordingly, under these circumstances, the best course of action is to remand to the district court for that court's application of the correct legal standard to the evidence at trial. The district court may then address the specific allegations of SBT negligence that Beachner claims were essentially rejected by the court's holding that SBT breached no duty because its cable relocation successfully "avoided any conflicts" after completion of construction. According to Beachner's brief, these allegations of SBT negligence include (1) relocating the cable at the West location in the same area where Beachner was required to excavate; (2) burying the cable at 3 feet, when it was aware that Beachner would be digging to a depth of 5 feet in this area; and (3) failing to disclose to Beachner the actual depth of its cable at the West location. Whatever Beachner's specific allegations of SBT negligence are—both before and during Beachner's construction—we agree that the district court's legal ruling substantially limiting SBT's duty had the effect

of erroneously and prematurely rejecting these Beachner contentions as a matter of law.

In conclusion, we hold that the district court incorrectly determined SBT's duty of care. Because we are not equipped, or disposed, to determine if SBT met its duty of care under K.S.A. 17-1902, we reverse the district court and remand for proceedings consistent with this opinion.