No. 113,335

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Guardianship and Conservatorship of ELLA MAE BURRELL, an Adult with an Impairment.

SYLLABUS BY THE COURT

1.

A district court's decision to deviate from the placement preferences set out in K.S.A. 2014 Supp. 59-3068(a) and K.S.A. 58-627(b) is reviewed for an abuse of discretion.

2.

The term "good cause" as used in K.S.A. 58-627(b) requires consideration of what is in the best interests of the ward, including the proposed guardian or conservator's ability to fulfill the statutory requirements of the appointment.

Appeal from Sedgwick District Court; TIMOTHY G. LAHEY, judge. Opinion filed February 12, 2016. Affirmed.

*J. Shawn Elliott*, of Shawn Elliott Attorney at Law, of Wichita, for appellant.

*Nancy Ogle*, of Ogle Law Office, L.L.C., of Wichita, guardian ad litem.

Before ARNOLD-BURGER, P.J., GREEN and STANDRIDGE, JJ.

ARNOLD-BURGER, J.: When a court is asked to appoint a guardian or conservator for an adult with an impairment, the court is required to give priority to any person the adult nominated to be his or her guardian or conservator within a durable power of attorney. K.S.A. 2014 Supp. 59-3068(a). However, the court may bypass the adult's

1

nominee and appoint someone else "for good cause." K.S.A. 58-627(b). Prior to her impairment, Ella Mae Burrell nominated her youngest daughter, Felecia Burrell, to be her conservator within a durable power of attorney for health care decisions. Once Ella Mae became impaired, the district court bypassed Felecia and appointed Felecia's sister Beverly Burrell-Griffin to be Ella Mae's guardian and her brother Anthony Burrell to be Ella Mae's conservator. Felecia appeals, asserting that the reasons given by the district court for bypassing her did not rise to the level of good cause. Because we find that the district court did not abuse its discretion in finding that good cause existed to bypass Felecia, we affirm.

FACTUAL AND PROCEDURAL HISTORY

We begin by noting that there is no dispute in this case that Ella Mae loves all of her eight children and all of her children love her and want what is best for her. There is also no dispute that Ella Mae's physical and mental condition has reached the point where she is in need of a guardian and conservator. The dispute here involves which sibling(s) should be appointed to fill these roles.

In 2004, Ella Mae signed a Durable Power of Attorney and a Durable Power of Attorney for Health Care Decisions naming her daughter, Felecia, as her power of attorney and nominee for guardian and conservator in the event such a care giver was ever needed. In 2009, the 2004 Durable Power of Attorney was replaced by a new Durable Power of Attorney that did not name a nominee for guardian or conservator. The 2004 Durable Power of Attorney for Health Care Decisions, however, remained in effect.

In 2014, the family determined that Ella Mae was in need of a guardian and conservator. Three of Ella Mae's daughters—Felecia, Beverly, and Barbara James—filed competing petitions seeking to be appointed guardian. Barbara subsequently withdrew her petition. Over the course of several months, the district court allowed Felecia,

2

Beverly, and Ella Mae's guardian ad litem (GAL), Gwynne Birzer, to present evidence relevant to the qualifications of the women for the post.

The testimony of a number of witnesses called into question the fitness of Felecia for the positions of both guardian and conservator. There was extensive testimony that Felecia had an antagonistic relationship with all but one of her other siblings that negatively impacted Ella Mae. Beverly testified that she had difficulty obtaining updates on Ella Mae's health because "Felecia had became [*sic*] very hostile. When I inquired about what is going on with my mother, she refused [to tell me] and hung up the phone." Barbara told the court that she was withdrawing her petition to act as guardian because she wanted to remove herself from a situation that Felecia had made unbearable. For instance, Barbara claimed that Felecia had called the Department of Children and Families and made reports that her siblings were not properly caring for their mother.

Felecia herself testified that her relationship with her siblings is "[v]ery estranged. And stressed." She testified to several episodes in which she sought police involvement to moderate her relationship with her siblings. In February 2014, Felecia filed a protection from abuse (PFA) petition against her brother William Burrell because he allegedly threatened to harm her. As part of the ex parte PFA order, Felecia received authority to evict William from the house he shared with Ella Mae. She executed the eviction by having the locks changed while William was out of the house so he could not reenter upon his return. Felecia later stopped by the house to visit her mother, saw William at the home with Ella Mae, and called the police to have him removed. The PFA action was eventually dismissed. Felecia testified to another episode in which she picked Ella Mae up from her house and took her out for a ride. When they returned, the sibling who was scheduled to provide evening care was not at the house. Felecia attempted to call her sister Barbara twice to figure out why no one was home, then called the police because Barbara did not answer. Felecia testified that she believed this was the best

3

course of action because she thought the police could contact Barbara for her and that Barbara might answer the phone for them.

Felecia's use of Ella Mae's debit card, during the time Felecia was acting as Ella Mae's power of attorney, also became an issue during the hearings. Although the court did not find that Felecia had misused Ella Mae's debit card, the court found that her testimony regarding her use of Ella Mae's debit card was not credible and Felecia could not be trusted to handle Ella Mae's finances.

In addition to the testimony received during the hearings, the district court had the advantage of a report by the GAL to guide it in its appointment of a guardian and conservator. The GAL advised against appointing Felecia. Her report made note of the fact that Felecia not only failed to provide her siblings with updates on their mother's health but also prohibited the nursing home staff from sharing information with them. The report expressed concern that this behavior was not in Ella Mae's best interests. The GAL was also concerned with Felecia's use of Ella Mae's debit card, questioning many of the same purchases that were addressed during the hearings. Ultimately the GAL recognized that Felecia should be accorded priority in appointment based on Ella Mae's Durable Power of Attorney for Health Care Decisions but urged the court to bypass Felecia in favor of other siblings.

The district court's order appointed Beverly as guardian and Anthony as conservator. The court acknowledged that the order departed from the statutory preference set out in K.S.A. 2014 Supp. 59-3068(a) and attached to its order specific findings of fact and conclusions of law justifying the departure. Felecia filed a timely appeal of the district court's order.

4

ANALYSIS

Felecia argues that the district court erred when it bypassed her as guardian and conservator for her mother Ella Mae in favor of Beverly and Anthony. Felecia claims that since she was listed as Ella Mae's proposed guardian and conservator in her 2004 Durable Power of Attorney for Health Care Decisions, she should have been given priority under K.S.A. 2014 Supp. 59-3068(a)(1). Felecia acknowledges that nominees may be bypassed for good cause or disqualification but argues that the district court failed to make a valid finding of good cause prior to bypassing her and appointing her siblings. In order to resolve her claim, Felecia asks this court to interpret K.S.A. 58-627(b) and define "good cause or disqualification" as it applies to K.S.A. 2014 Supp. 59-3068(a).

*Standard of Review*

We find that whether the district court erred in finding that there was good cause to deviate from the placement preferences set out in K.S.A. 2014 Supp. 59-3068(a) is reviewed for an abuse of discretion. See *In re T.S.W.*, 294 Kan. 423, 436, 276 P.3d 133 (2012) ("We review a district court's finding that good cause exists to deviate from [Indian Child Welfare Act's (ICWA)] placement preferences for abuse of discretion."); *In re Adoption of B.G.J.*, 33 Kan. App. 2d 894, 900, 111 P.3d 651 (2005) ("[T]he term 'good cause' without further legislative definition was designed to provide state courts with some flexibility. . . . [Citation omitted.] Because flexibility implies discretion, we will employ an abuse of discretion standard of review."), *aff'd* 281 Kan. 552, 133 P.3d 1 (2006); *In re Lake*, 7 Kan. App. 2d 586, 588, 644 P.2d 1368 (holding "a guardian may be removed at the discretion of the court"), *rev. denied* 231 Kan. 800 (1982).

*Statutory Provisions Governing Appointment of a Guardian or Conservator*

K.S.A. 2014 Supp. 59-3068, part of the act for obtaining a guardian or conservator, or both, outlines the order in which a court should consider potential appointees for the position of guardian or conservator. It provides that the court, in appointing a guardian or conservator, must first give priority to the "nominee of the proposed ward or proposed conservatee, if such nomination is made within any durable power of attorney." K.S.A. 2014 Supp. 59-3068(a)(1). On the other hand, K.S.A. 58-627(b) is located in a statutory subsection titled "Durable Power of Attorney for Health Care Decisions." This statute mirrors K.S.A. 2014 Supp. 59-3068 in that it establishes that a principal may nominate a guardian or conservator in his or her durable power of attorney for health care decisions. K.S.A. 58-627(b) likewise requires that the court make any appointments consistent with the principal's nomination, but it goes on to allow the court to deviate from the principal's most recent nomination "for good cause or disqualification."

*Definition of Good Cause*

Good cause, defined by Black's Law Dictionary 266 (10th ed. 2014), as "[a] legally sufficient reason," is a phrase that is not uncommon in the Kansas Statutes. See for example, K.S.A. 2014 Supp. 22-3210(d)(1) (a plea may be withdrawn "for good cause"); K.S.A. 16-1307(a) (supplier must show "good cause" for termination, cancellation, or nonrenewal of a contract); K.S.A. 2014 Supp. 60-455(e) (the court may modify the timing of disclosure of evidence the prosecution intends to offer for "good cause").

Although "good cause" has not been defined by our Supreme Court in the specific context of bypassing the statutory priorities contained at K.S.A. 2014 Supp. 59-3068(a)(1) and K.S.A. 59-627(b), it has been defined in similar contexts to clearly

6

incorporate the best interests of the incompetent adult. See *In re Estate of Osborn*, 179 Kan. 365, 371-72, 295 P.2d 615 (1956) (removal or replacement of an incompetent adult guardian when he or she is "*incapable of performing the duties of his [or her] trust*"); *In re Lake*, 7 Kan. App. 2d at 588 (guardian could be removed "for good and sufficient cause and the best interests of the ward may constitute such good cause"). These holdings were later codified by the legislature at K.S.A. 59-3088(c), vesting the courts with the authority to remove a guardian or conservator "whenever the court determines that it is in the best interests of the ward or conservatee to do so." While K.S.A. 59-3088(c) does not mention "good cause," it is nevertheless instructive in this case. If the best interests of the ward provide sufficient grounds to remove a guardian, it seems clear that the best interests of the ward must be considered in determining whether there is good cause to bypass someone in the appointment of a guardian.

Likewise, in other similar situations involving guardians for children, the best interests of the ward are of primary importance. See *In re Adoption of B.G.J.*, 281 Kan. 552, 133 P.3d 1 (2006) (interpreting placement preferences in the ICWA and the ability to deviate upon good cause shown, with primary consideration to be given to the best interests of the child); *In re Guardianship of T.D.S.*, 13 Kan. App. 2d 275, 277-78, 769 P.2d 32 (upheld the district court's determination passing over the nominated guardians in favor of guardians it felt were in the children's best interests), *rev. denied* 245 Kan. 784 (1989).

In addition to caselaw, other statutes in the probate code's section on guardians and conservators provide guidance on how we should interpret K.S.A. 58-627(b). K.S.A. 2014 Supp. 59-3068(b)(1) sets out several factors a court should consider when appointing a guardian. The statute instructs the court to consider "the workload, capabilities and potential conflicts of interest of the proposed guardian or conservator, or both." K.S.A. 2014 Supp. 59-3068(b)(1). K.S.A. 2014 Supp. 59-3075 outlines a guardian's duties and responsibilities. Among other things, guardians are required to:

"become and remain personally acquainted with . . . other interested persons associated with the ward and who are knowledgeable about the ward"; "at all times act in the best interests of the ward"; "exercise reasonable care, diligence and prudence"; "provide for the ward's care, treatment, habilitation, education, support and maintenance"; and, "promote and protect the comfort, safety, health and welfare of the ward." K.S.A. 2014 Supp. 59-3075(a)(2), (b)(2), (b)(6). The factors explicitly listed in K.S.A. 2014 Supp. 59-3075(a) and (b) are enumerations of the considerations that go in to determining whether a guardian will act within the best interests of the ward—if the guardian acts in the ward's best interests, he or she will naturally do things like provide for the ward's care and promote the comfort, safety, and health of the ward.

As mentioned briefly above, K.S.A. 59-3088 discusses the process and grounds for removing a guardian or conservator. K.S.A. 59-3088(c) gives the courts the power to immediately suspend "the powers and authorities of a guardian or conservator, or both, whenever the court determines that it is in the best interests of the ward" to do so. K.S.A. 59-3088(e) allows for removal of a guardian or conservator after a hearing when it has been shown by a preponderance of the evidence that the guardian has failed to "fulfill the duties or responsibilities of being a guardian or conservator, or for the manner in which the guardian or conservator has exercised the powers or authorities granted to" him or her.

In looking at the state of guardianship appointment laws broadly, the American Jurisprudence has summarized:

> "In determining who shall be a disabled person's guardian, the disabled person's personal preferences as to who should be his or her guardian is outweighed by what is in the disabled person's best interest. . . . Of paramount concern in the selection of a guardian, regardless of the disabled person's choice, is the best interest and well-being of the disabled person . . . .

8

> "A court may decline to appoint as guardian the person nominated in a health care directive if the court determines appointment of another is in the best interests of the ward." 39 Am. Jur. 2d, Guardian and Ward § 43, pp. 51-53.

All of this leads to the conclusion that for the purposes of K.S.A. 58-627(b) good cause, at the very least, involves consideration of what is in the best interests of the ward, including the proposed guardian's or conservator's ability to fulfill the statutory requirements of the appointment.

*Application of the Law to the Facts of this Case*

Having considered what constitutes good cause for purposes of K.S.A. 58-627(b), it is necessary to determine whether the district court abused its discretion in finding such cause to bypass Felecia. A judicial action constitutes an abuse of discretion if the action is (1) arbitrary, fanciful, or unreasonable so that no reasonable person would have taken the view adopted by the district court; (2) is based on an error of law; or, (3) is based on an error of fact. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

Here, the district court made fairly extensive findings of fact both orally at the final hearing on this issue and in the order appointing the guardian and conservator. The district court recognized that, based on the Durable Power of Attorney for Health Care Decisions Ella Mae signed in 2004, Felecia had priority as guardian under K.S.A. 2014 Supp. 59-3068(a)(1) followed by Barbara, then Anthony, then Beverly. Nevertheless, the court found that there was good cause to skip over Felecia and Anthony (Barbara opted to remove herself from consideration). The court explained:

> "The evidence produced at trial reflects that Felecia Burrell has not acted in Ella Mae Burrell's best interests, nor exercised reasonable care, diligence and prudence during the pendency of this case. Her actions, and the actions of Anthony Burrell have been

9

inconsistent with the duties that would be required if either were to serve as guardian. While the court recognizes that Felecia was not the temporary guardian, her actions show that when given the opportunity, she did not act on Ella Mae's best interests."

In support of this conclusion, the district court cited numerous facts influencing its decision, including: (1) Felecia refused to assist her siblings in the daily care of Ella Mae; (2) "Felecia has been antagonistic with her siblings, and has placed a higher priority on maintaining sibling conflict than on the care and best interests of her mother"; (3) Felecia refused to provide her siblings with information related to Ella Mae's health; (4) Felecia was not honest and candid with the court regarding financial transactions made on Ella Mae's behalf; and, (5) Felecia was not honest and candid with the court regarding her relationship with her sister Beverly and her ability to provide Beverly with information regarding Ella Mae. Additionally, the court cited the episode described above in which Felecia took Ella Mae out for an unspecified period of time and returned to the house to find that the sibling who was supposed to provide evening care for Ella Mae was not home and called the police. The district court was concerned with this behavior because it once again demonstrated Felecia's willingness to put conflict over care and "casts doubt on Felecia's concern, ability and willingness to properly care for her mother."

Felecia argues that the district court erred in its determination that it was in Ella Mae's best interests that she not be appointed guardian and conservator. She complains that a "family feud" is not good cause to disqualify her from the appointment, that the district court erred in finding that she was not transparent with the financial transactions she made on behalf of Ella Mae, and the district court erred when it found that Felecia was not credible based on her testimony that she had no contact information for Beverly.

The first of these alleged errors is best viewed as a legal error—a claim that the district court did not correctly interpret good cause. Felecia cites no legal support for her

10

allegation that it is improper for the district court to consider family dynamics and the ability of the proposed guardian to communicate with other interested parties when making its decision regarding guardianship. In fact, the one citation Felecia does make is to K.S.A. 2014 Supp. 59-3075(a)(2) which commands guardians to "become and remain personally acquainted with the ward, the spouse of the ward and with other interested persons associated with the ward." Felecia attempts to argue that this language is optional and relationships with others interested in the ward are only necessary "for the purpose of knowing the wishes and desires of the Ward—not for satisfying the family's desires and emotions." Felecia's interpretation does not accord with the plain meaning of the statute, nor is it consistent with the general statutory notion that the best interests of a ward are paramount. Based on the caselaw and statutes discussed above in relation to finding good cause, it is clear that the district court did not err in finding that family dynamics were an important consideration in appointing a guardian in this case.

Felecia's remaining allegations suggest that the district court made factual errors, first in finding that she lacked transparency in financial matters, then that she lacked general credibility. It is important to note that appellate courts do not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *Southwestern Bell Tel. Co. v. Beachner Const. Co.*, 289 Kan. 1262, 1274-75, 221 P.3d 588 (2009). What this court may do is review the record to ensure that it contains substantial competent evidence supporting the findings of fact that were made by the district court. 289 Kan. at 1274. Substantial competent evidence is "'such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion.'" *Gannon v. State*, 298 Kan. 1107, 1175, 319 P.3d 1196 (2014).

The record here contains substantial competent evidence supporting the district court findings. Felecia was questioned about a number of transactions she made using Ella Mae's debit card while acting as her power of attorney. In particular, there were a number of transactions during the period of time Ella Mae was either in the hospital or in

11

a rehabilitation facility that were questioned, including: $206.59 spent at Walmart on "Lucerna briefs, wipes; things to prepare for [Ella Mae] to come home"; $100.36 at Walmart for "a blood pressure monitoring meter, a thermometer, a heating pad, and some glass storage containers" for Ella Mae; a charge of $23.55 at Joe's Car Wash for two cans of air freshener; $15.01 to Presto which "could have been for gas;" on December 27th at Popeye's, the 28th a charge at Popeye's, the 29th at Panera, the 30th for a burger and fries at Wendy's and twice at KFC, and the 31st to Popeye's and Wendy's (all transactions were allegedly for food for Ella Mae despite the fact that Ella Mae was on a diabetic diet); $55.71 at TJ Maxx for clothes for Ella Mae; and, $85.10 to Ross Stores also for clothes for Ella Mae.

The district court was able to watch Felecia testify about these transactions. The court found that Felecia's testimony, especially regarding the purchases of food, was not credible. Felecia's testimony provides evidence from which a reasonable person might conclude that she was not being entirely honest with the court. In particular, the three purchases on December 30th call into question her testimony that all food was for Ella Mae.

There is also substantial competent evidence supporting the conclusion that Felecia was not honest with the court regarding her ability to contact and provide information regarding Ella Mae's health to Beverly. Felecia testified repeatedly that she had no contact information for her sister Beverly and so was unable to share information with her. On cross-examination, Ella Mae's GAL impeached Felecia's testimony by introducing a print-out of text messages exchanged between Felecia and Beverly over the course of several months prior to the hearing.

Moreover, the district court noted that once Beverly was appointed temporary guardian, Felecia chose not to participate in her mother's care with the other siblings,

12

again showing her willingness to put her own animosity toward her siblings above the care and best interests of Ella Mae.

The district court did not abuse its discretion when it determined that there was good cause to appoint someone other than Felecia as guardian and conservator of Ella Mae. There is substantial evidence in the record that Felecia's relationship with her siblings interfered with Ella Mae's interests, and that appointment of Felecia would have been contrary to Ella Mae's interests because Felecia was not entirely trustworthy. Accordingly, the decision of the district court is affirmed.

Affirmed.