IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,005

STATE OF KANSAS,
*Appellee*,

v.

COREY POLLARD,
*Appellant*.

SYLLABUS BY THE COURT

1.

A prosecutor does not err by introducing gang affiliation evidence as limited by the district court at a pretrial motions hearing, when the prosecutor has not misled the judge to obtain the governing order.

2.

A district judge is not compelled to allow a criminal defendant hybrid representation, and the defendant in this case failed to demonstrate any harm flowing from the court clerk's transmission of a pro se motion to compel discovery to defense counsel for any further action.

Appeal from Sedgwick District Court; DAVID J. KAUFMAN, judge. Opinion filed July 21, 2017. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, argued the cause and was on the brief for appellant.

1

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Under the pretense of buying marijuana, defendant Corey Pollard and three other men met with Paul "Danny" Khmabounheuang. The group's actual plan was to rob Khmabounheuang. A struggle over a gun followed the demand for all of Khmabounheuang's drugs, and two of the would-be robbers were shot and injured. Khmabounheuang was shot and killed.

A jury convicted Pollard of first-degree felony murder and aggravated robbery. On appeal, Pollard argues that the prosecutor erred by seeking to introduce gang affiliation evidence and that Sedgwick County's method of dealing with pro se motions violated his due process rights.

For the reasons outlined below, we affirm Pollard's conviction.

FACTUAL AND PROCEDURAL BACKGROUND

On November 13, 2013, about 11:30 a.m., Tawny Wares and her 3-year-old daughter went to the Wichita house where Khmabounheuang was staying. Wares had met Khmabounheuang a few days earlier. The house was on North Holyoke. Khmabounheuang, a tattoo artist, had come to town 4 or 5 days earlier to stay with his uncle, Ky Sayapheth. According to Wares, she and Khmabounheuang were going to hang out, smoke marijuana, and discuss designs for a Chinese dragon tattoo on Wares' back.

About an hour after Wares arrived, Khmabounheuang went outside to take a phone call. When he came back inside, he asked Wares to take her daughter into a back

room because some people were coming over to buy drugs. Khmabounheuang went back outside while Wares waited at a front window until the people arrived. Eventually a "white Ford Excursion . . . a Blazer-type looking truck" pulled into the driveway, turned around, and parked in the street. The truck had an "In Loving Memory of . . ." sticker in the back window. Wares could see two people sitting in the front seat and at least one person moving in the back seat.

At that point, Wares took her daughter into the back room. Because the door to the room would not latch, Wares paced near the door to prevent her daughter from running back out. From where Wares was standing, she could see two African-American men "dressed in all black; black hoodies, black pants, black shoes, black gloves, black hats" come through the front door.

One of the men came into the back room and asked Wares for her cell phone. Wares refused. As the man repeated his request, Wares' daughter tried to run out the door. When the man blocked the girl, Wares saw that he had a gun. At that point, Wares gave the man her phone, and he left the room. Wares would later testify that the man was an African-American wearing a "black beanie" and that he had "dreads, with blond tips at the end of them."

Not long after the man left the back room, Wares heard gunshots. She would testify that there were seven—"three steady ones and then four quick ones." Based on what she heard, Wares believed there were at least two guns fired.

Wares grabbed her daughter and tried to huddle behind a big TV near a wall. Wares expected the men to come into the back room and shoot her, but they never did. Eventually, Wares peeked out from behind the door into the room and saw a body lying on the floor. Wares and her daughter then ran out the back of the house.

3

As the two walked up the street, they ran into Sayapheth. Wares told Sayapheth that something bad had just happened, but she was not sure what. While Wares and Sayapheth were talking on the street, a woman came up to ask if Wares was OK. Sayapheth told the woman everything was fine.

Wares and Sayapheth went back to the house to get some personal items. They then got into Wares' car and left the scene.

The same afternoon, Lacey Webster, a postal worker, was delivering mail in the neighborhood. She heard a "pop pop pop," but, because of construction in the area, she assumed the sound came from a nail gun. As Webster continued on her route, a man ran past her. She then saw two more men running, one of whom "jumped in a vehicle and took off." Webster was able to get the license plate of the vehicle as it drove away.

At trial, Webster would describe the men she saw that day as younger black men wearing black clothing. She would describe the vehicle as an early 2000s white Ford Explorer with a big "In Loving Memory" sticker that "took up the whole back window."

Michelle Pitman was driving down 14th Street when she saw the door of a house near 14th and Holyoke "fly open" and two men run out of the house. Pitman pulled over and called 911. While on the phone, she saw a woman come out of the back of the same house. Pitman could tell that the woman was in distress. Pitman drove over to the woman and asked if everything was okay. A man who was with the woman told Pitman everything was fine and gestured for her to leave.

Captain Robert Bachman of the Wichita Police Department was one of the first officers to respond to the 911 dispatch about the shooting. As Bachman drove to the

4

scene, he saw a young black man sitting on a curb, holding his right leg. Bachman stopped and got out of his car. As he did so, he saw what appeared to be a gunshot wound to the man's lower leg. Bachman radioed dispatch to request emergency medical services.

The man told Bachman that he had been walking west down 14th Street or 15th Street when he heard several gunshots. He claimed that he took off running after being struck in the leg by one of the shots. EMS eventually arrived and took the man to a hospital. At trial, Bachman would identify the man as Dijon Thomas.

While waiting for EMS, Bachman noticed that Thomas had left a trail of blood to the curb. As more officers arrived on the scene, Bachman had some of the officers follow the trail. Other officers were asked to do a "knock and talk" in the neighborhood.

One of the officers conducting the knock and talk was Officer David Goodman. Goodman knocked on the front door of the house on the corner of 14th and Holyoke and found the door was partially opened. Goodman pushed the door open and "could clearly see a lifeless looking body [lying] on the ground."

At about the same time, other officers were dispatched to a second shooting call in the 4900 block of East Harry. Officers Gary Morris and Stephanie Neal responded and found a man in a parking lot of an apartment complex. The man identified himself as Orville Smith. Smith said he had been shot in the stomach. He claimed that he had been standing near some mailboxes to the east of the parking lot when he was shot. Residents who lived nearby had not heard gunshots or anything sounding like gunshots.

In the parking lot, officers also found a white SUV that matched the description of the vehicle that had left the Holyoke scene. The license plate number matched the number observed by Webster, and the back window had an "In Memory of" design on it.

5

Early in their investigation, the police discovered that Sayapheth was associated with the address where the body was found. When investigators contacted Sayapheth, he told them that the body was probably that of his nephew. He also told investigators that they should talk to Wares.

Based on witness accounts, investigators initially believed they were looking for four individuals. They had identified Thomas and Smith as suspects, but they were still trying to locate two other African-American males seen running away. Detective Joseph Stearns, a gang intelligence officer, checked the police database for gang affiliations. Stearns first confirmed that the victim was not a known gang member. He then found that both Thomas and Smith were flagged in the database as Folk Gangster Disciples members.

Stearns then checked social media postings of known gang members. He found comments stating "RIP Dallas Guy" and other comments alluding to Guy's death in a shooting. Stearns noted that the time stamps for the posts were within "minutes or hours" of the shooting on Holyoke. Stearns also checked a whiteboard detectives were using to keep track of the Holyoke investigation and saw that the name "Dallas Guy" had already surfaced.

Although the reports of Guy's death turned out to be erroneous, the information led Stearns to identify another suspect. As Stearns began looking into Guy, he was able to connect Guy to Pollard within the previous 3 weeks. Stearns did not look Pollard up in the database, but he knew, based on earlier interaction with Pollard, that Pollard was a documented member of the Folk Gangster Disciples.

Shortly after making the connection between Guy and Pollard, Stearns went to observe a police interview of Wares. During that interview, Wares identified one of the missing suspects as a black male with white- or blond-tipped dreadlocks. Stearns knew Pollard had blond-tipped dreadlocks. Investigators created a photo array that included a picture of Pollard. When Wares was shown the array, she picked out Pollard's picture and identified him as the man who had come into the back room with a gun.

After Wares identified Pollard, police officers went to Pollard's grandmother's home looking for him. Pollard was not there, but Pollard's uncle, who lived at the home, told officers that he had been there earlier in the day.

Officers were not able to find Pollard on November 13, but a week later they received information about Pollard's whereabouts and were able to arrest him. Pollard— along with Smith, Thomas, and Guy—was charged with three counts: first-degree felony murder of Khmabounheuang based on either aggravated robbery or distribution of a controlled substance, aggravated robbery of Wares, and attempted distribution of a controlled substance. At the conclusion of the evidence at Pollard's trial, the State would dismiss the distribution of a controlled substance charge.

Casey Cotton was appointed to represent Pollard.

After preliminary hearing, a district judge filed a journal entry stating, "Discovery is ordered pursuant to statute and case law." About 6 weeks later, Pollard filed a pro se motion seeking to compel the State to turn over various items and information, including any written or recorded statements or confessions made by Pollard. The motion also specifically requested "all records and information revealing prior convictions, guilty verdicts and juvenile adjudications attributed to each witness to be called by the State." The same day the motion was heard, a deputy clerk from the District Court Criminal

7

Clerk's Office sent Cotton a letter with a copy of the motion attached. The letter stated that the clerk's office had received a pro se motion from his client and that it had been filed in the court file. "[B]ut no hearings have been scheduled [and no] further action will be taken"; the court, the letter said, would "await further direction from [Cotton] as to how to proceed on this matter."

More than 3 months later, Cotton filed a motion for specific discovery, requesting the court compel the State "to . . . provide the criminal history of all endorsed State witnesses, excluding law enforcement individuals." On the same day, Cotton filed a Motion in Limine. Item "D" in the motion addressed discovery:

"D.     ALL DISCOVERY NOT PROVIDED TO MR. POLLARD'S COUNSEL AT THE TIME OF THIS MOTION'S HEARING.

"As a matter of right, Mr. Pollard is entitled to discovery pursuant to (1) Kansas statute, *K.S.A. 22-3212* and its applicable portions, (2) the United States Constitution, and (3) the order of discovery issued by the Eighteenth Judicial District at the time of this matter's preliminary examination. Discovery must be completed no later than twenty (20) days after arraignment or at such reasonable later time as the Court permits. *See K.S.A. 22-3212(6).*"

Cotton filed a notice of alibi 3 days later. According to the notice, Pollard intended to present evidence that he was at the home of Rachel Peters, his grandmother, at the time the alleged crimes took place.

Within 3 days of the alibi notice, the State filed a notice of its intent to admit gang evidence in its case in chief.

The district judge heard argument on various pending motions the week before trial. Pollard was present for the hearing. The State, in the person of prosecutor Jennifer Amyx, addressed Cotton's motion for specific discovery. She said that the State was still in the process of doing background checks and advised the court and defense counsel that it would provide the results before the witnesses took the stand. Amyx also acknowledged that state law imposed an ongoing duty on the State to do so.

During discussion of the motion in limine, Cotton referenced item "D," expressed confidence in the State's knowledge of its continuing discovery obligations, and said he had no reason to believe he did not have "all the discovery." The district judge stated that both counsel believed discovery had been provided.

The judge also heard arguments on the State's motion to introduce gang evidence. Amyx first attempted to distinguish what the State sought to present from what is typically considered gang evidence.

> "I've heard a wide array of evidence be referred to as gang evidence. Everything from an officer who is introducing himself to a jury saying, [']I presently work under the gang unit,['] clear up to what might be thought of as typical gang evidence where a gang officer, an intelligence officer, takes the stand and relates the nature and history of a certain gang as well as a particular individual or set of individuals' association with specific gangs from that point forward.
>
> "The Court may ultimately, frankly, decide that the subject matters of this particular trial are not even gang evidence but simply part of an investigation into a murder and an attempt to identify specific subjects. But I filed the motion in an abundance of caution because, of course, I wanted Mr. Cotton to . . . have an opportunity to be heard prior to the evidence coming forward."

9

The State then gave the court its three bases for admitting the evidence including gang references and relationships that it had in mind. The first was for the identity of the defendant. "As this Court then is probably aware just from the notice of alibi, identity is the key and central issue in this particular trial." The second basis was the relationship of the codefendants. The third basis was credibility of Pollard's codefendant, Smith, who would be testifying on behalf of the State.

"[MS. AMYX:] I would not classify this as a gang case. It is a felony murder case. The State is not going to put a gang expert up on the stand to announce the defendant's status as a gang member or the other three codefendants' status as gang members. Three are documented Gangster Disciples and Mr. Thomas is documented as a Crip and an allied gang—or Dallas, I apologize.

"Regardless, this evidence comes in through Officer [Stearns], and defense has his report. He, in his report—the murder takes place, witnesses indicate that three to four young black men are seen fleeing the scene. . . . The officers are able to identity OT Smith and Dijon Thomas because they have gunshots. Based on that information and knowing that they're looking for one to two other individuals, one with some specific clothing, knowing that both Mr. Smith and Mr. Thomas are documented, they start doing research.

"That research leads them to Facebook pages of gang members who are talking about a shooting that just took place and RIP, r-i-p, Dallas Guy. So now they have three names, Smith, Thomas and Guy, who was the fourth codefendant.

. . . .

"THE COURT:  Okay. So they go to Facebook. And what was the RIP, rest in peace for?

"MS. AMYX:  For Dallas Guy, which is the first time that this officer has heard that name associated with this case. What he hears is—he's going to other gang members'

Facebook pages to see if he can find anything out about the shooting. . . . Because he got two gang members involved in a shooting and gang members are referencing a shooting which just took place, RIP Dallas Guy. First time this officer has heard that name associated with this case.

. . . .

"THE COURT: Is he dead?

"MS. AMYX: No. Well, he is not dead, but at the time his family members and friends thought he was. . . . Based on that new name, then, Officer [Stearns] does some investigation into Dallas Guy. And he has had recent contact in the system within the last month, in fact, in three weeks, and he's associated with Corey Pollard in one of his most recent cases. Mr. [Stearns], having worked in the gang unit, is familiar with these individuals, how they look, who they associate with. He goes into the investigators' room to let them know what he has learned, and at that time Tawny Wares, who is an eyewitness that was present in the home as a friend of the victim, is giving her statement to the police, and she is describing the man inside the home who held her and her three-year-old daughter up at gunpoint.

. . . .

"MS. AMYX: She describes that individual as having long dreads, and specifically that those dreads have blond tips or portions on them. Mr. [Stearns] is familiar with Smith, Thomas, Guy and that they don't have dreads, but . . . Mr. Pollard does. He also recalls that Mr. Pollard has the blond tips, which is unique at least to him.

. . . .

"MS. AMYX: He goes back in, pulls a photo of Mr. Pollard, sets it up in a photo array. And that photo array is then presented to Tawny Wares who picks Mr. Pollard out as the individual who held her up at gunpoint. That's how we get to all of that.

11

"So, Judge, rather than, frankly, classifying this as gang evidence, I think I would class it more akin to kind of how we treat CODIS and AFIS when we're dealing with identity in cases. My expectation is that Officer [Stearns] can testify that he did research into the database, that he learned that the two individuals were connected within the last month. And he can do that without referencing the robbery or the burglary, which were just the types of crimes that were alleged to have occurred, and he can talk about his knowledge of that.

"He doesn't have to say that Mr. Pollard is a gang member because of these identifying factors under a statute, or relate the nature and history of the particular gang that he belongs to. But it is important to note the relationship of these four people and how this investigation proceeds. I think we can do that in a way that narrowly carves that out without referencing criminal activity, which is sort of the defining point – the cutoff point for evidence of this type. That would be I guess what could be termed the gang evidence in [Stearns'] testimony."

The judge granted the State's motion to admit the evidence, stating:

"The State's motion is granted and it's under these following parameters . . . . [E]vidence that Mr. Pollard, Mr. Thomas, Mr. Smith, . . . are members of the street gang the Folk Gangster Disciples is admissible. It's admissible as relates to the identity of the defendant, it's admissible as relates to the relationship of the parties. I essentially would adopt [the State's] proffer factually as it relates to the [identity] of the defendant and the relationship of the parties as my basis for finding that the gang evidence is admissible.

"To that end, the evidence presented to the jury as relates to street gang evidence under the proffer given to me would essentially be no more than—whether it's a Wichita Police Officer testifying or somebody else, but if it's law enforcement, that the defendant is documented in the Wichita Police Department database as a member of the street gang Folk Gangster Disciples, as is Mr. Thomas and Mr. Smith. That's all that needs to be said. It's not necessary to explain to a jury what a street gang is because that gets into areas that are dangerous that cause issues in the event there is a conviction.

12

"But most importantly, in today's society it's common knowledge what a street gang is. And I'm not going to detour this ruling and allow for evidence to come in that, I'm a gang expert and street gangs do these types of crimes and street gangs gather for this type of purpose. It's sufficient for ID and relationship of the parties, just a street gang. It's just so basic.

"With that said, if Mr. Cotton wants to raise an objection to no foundation for that evidence, then he will open the door and it will all come in.

"You certainly can preserve, if you deem it appropriate, Mr. Cotton, an objection based on my ruling, but if you stand up in front of the jury and a police officer is testifying and says your client is a member of a street gang and you say, objection, Your Honor, no foundation, the State will go through that door you've opened and give a foundation why. He's in the database, there are certain criteria. So if you want to contest that issue and require a foundation, you're putting yourself in a precarious position because the answer that will be given, that I've said is admissible, is that he is a documented gang member in the police database. If you object on no foundation, then you're saying the police database needs to be explored. Which if you do, you do not get to hand tie the State and say, well, they can't explain how you get into the database; self claiming, running with other bangers, wearing the colors. I mean—so just be forewarned. Because I have limited the State's evidence to the simple notion of you're documented in the police database as a gang member—street gang member, as are the other two defendants.

"And Ms. Amyx's analogy to CODIS, c-o-d-i-s, is a good one. CODIS is the—I can't remember, is that the fingerprint or the DNA base? . . . It's the DNA base. We know that the DNA base is almost all criminally based but we just say that it is a data system where people's DNA is in there and DNA is extracted. We don't say why it's in there, how you get in there."

The judge also rejected the testifying codefendant's credibility as a basis for admitting gang evidence.

"I think that's a questionable basis by the State simply because the case law that I have, and it's current and historically it references other cases, usually this issue of witness credibility arises when a defendant who is a gang member unknown to the jury calls a defense witness who is a fellow gang member and that gang member testifies favorably for the defense. Well, that's credibility.

. . . .

"And based on that proffer that [the State] gave . . . I understand the connecting of the dots. You know, the alleged perpetrators involved in the charged crimes from the State's theory, that is—at minimum you have three people that have an association with each other. It's just not a random occurrence that the three are together. I think that goes to that overriding theme of association and what have you."

In a later discussion of the association between Guy and Pollard, the subject of Guy's gang affiliation arose. This led to some confusion about the State's proffer of the basis for admitting gang evidence.

"THE COURT:  Well, let me stop you for a moment. My ruling is predicated on the proffer that was given to me. If that proffer subsequently at trial is incorrect you have a basis, number one, to object, possibly seek a mistrial.

"Again, you're telling me that three weeks before this [Pollard] and [Guy] are associated with a police incident, correct, Ms. Amyx?

"MS. AMYX:  Correct.

. . . .

"MS. AMYX:  . . . The second [clarification] is this Court was very clear when you were on your first issue that the—it was admissible that the defendant Thomas and

14

Smith are documented as Folk Gangster Disciples. You did not reference Dallas Guy. He is a Crip which is an aligned gang. I don't know that that matters that it's an aligned gang but that he is documented as well I think does matter especially because Officer [Stearns], the same officer whose report I referenced for the proffer and discussed with Mr. Cotton, Dallas Guy is right in between how they get from Thomas and Dijon then Dallas Guy then Corey Pollard. So for that to flow and for the jury to understand why they're even looking and going down this research path, that's why.

"THE COURT: And I had missed that in your comments this morning. Let me explore that just a moment. What's the association between Guy being a Crip vis-à-vis the three remaining defendants being Gangster Disciples?

"MS. AMYX: Aside from the fact that the two gangs are aligned he's simply what some might say very good friend or best friends with this defendant. Where OT Thomas and Dijon Smith are best friends. Corey Pollard, Dallas Guy, very close friends.

"THE COURT: Yeah, I got that. So what would be your mindset as far as presentation of evidence as relates to Guy being a Crip vis-à-vis the other three?

"MS. AMYX: It's just that one sentence literally, Judge, where [Stearns] would say I go based on the documented status of Guy and—or Thomas and Dijon I go start looking at Facebook pages of gang members, discover that there is a trend—a new trend about a shooting that day and a rest in peace for Dallas Guy. Knowing that Dallas Guy is documented I go and research Dallas Guy, locate a Corey Pollard. I go into a room to relay this evidence and find that a witness is talking about somebody who looks a lot like Corey Pollard because he's familiar with their images.

"THE COURT: You had stated all this this morning. I apologize. I didn't get that all written down."

The discussion then turned to how to handle Guy's gang status, as he was not a member of the same gang as the three others. Because Guy was not testifying, the State

agreed to limit testimony about Guy's gang affiliation to the fact that he was a documented gang member, which was enough to enable the State to explain how Pollard became a suspect. The district judge then ruled that Guy's gang status was admissible.

> "Well, the ruling on this would be that certainly you know Guy's status as a documented gang member is admissible for the same reasons previously stated, ID of the defendant, relationship to the parties.
>
> . . . .
>
> ". . . The fact that he's associated or recognized as a Crip is a distinction without difference under this proffer and these anticipated facts."

At trial, Stearns testified about his role in the investigation. He explained that he was a gang intelligence officer and that his department was responsible for maintaining the Wichita Police Department gang database, "which is [the department's] way of cataloging known gang members based upon the Kansas state statute."

Stearns testified that after the victim was identified, he confirmed that the victim was not a gang member. Stearns testified that he also looked into the two initial suspects, Thomas and Smith. Stearns was able to determine from the department's database that both Thomas and Smith were "flagged" as Folk Gangster Disciple gang members. During Stearns' testimony about Thomas and Smith, Cotton lodged a continuing objection to Stearns' testimony about gang evidence. The district judge noted and overruled the objection.

When discussing Smith, Stearns referred to him as "Orville, or OT Smith." The prosecutor asked Stearns why he referred to Smith by both names. Stearns responded "[OT] was his street name that I knew him by." The State then asked Stearns what a street

16

name was. Stearns answered, "Oh, what is a street name? It's just a nickname that is given to someone just by different origins. I mean, every gang has their own, could be a family nickname, it could be something that's given to them by another gang member." The State then moved on to general questions about what Stearns learned about Smith.

After establishing Thomas' and Smith's gang membership, Stearns testified that he started looking at the social media of other known gang members. According to Stearns, he was able to find several references to "RIP Dallas Guy" and other references to a shooting. Stearns then began looking into Guy and learned that he and Pollard were recently connected. Stearns did not elaborate on the nature of the connection. The exchange continued:

"Q. Based on locating the connection between Dallas Guy and Corey Pollard, did you research Corey Pollard?

"A. At that point, I did not, no. I'm sorry. Outside my own knowledge of him, just from past.

"Q. Well, I'm sorry. Maybe I asked a bad question. Were you familiar with Mr. Pollard?

"A. Yes.

"Q. Specifically with his status as to whether or not he was documented?

"A. Yes.

"Q. Was he documented as a gang member?

"A. Yes, he was.

"Q. What gang was he documented as?

"A. Also a Folk Gangster Disciple.

"Q. The same as OT [Smith] and Dijon [Thomas]?

"A. Correct."

Stearns then testified that he went to observe the interview of Wares. During that interview, Wares described the man who had come into the back room as a black male with blond-tipped dreadlocks. Stearns knew that Pollard wore dreadlocks matching Wares' description. He testified that, based on this information, a photo array including a picture of Pollard was created. Another officer would testify that Wares picked Pollard's picture out of the array.

Trial testimony from Wares and Sayapheth provided details about much of what had happened, but the State's primary witness implicating Pollard was his codefendant Smith.

Smith testified that he considered Thomas to be his best friend and admitted that both were members of the Folk Gangster Disciples. Smith also testified that he had known "Corey and Dallas" since approximately 2009, but he "didn't hang out with them." When asked whether Pollard was in the same gang as he was, Smith testified that he was. Smith also testified that Guy was in the gang.

According to Smith, he was close friends only with Thomas, not Pollard or Guy. He had Thomas' phone number saved in his cell phone. He also had Guy's phone number, but that was because Smith's brother, who previously owned the phone, had saved it. Smith did not have Pollard's phone number.

18

Smith testified that on the morning of November 13, he received a text from Guy stating, "'Wat up kin u drivin?'" When Smith did not respond, he got a call from Pollard, asking if Smith was driving. Smith told him no and asked what was up. According to Smith, Pollard told him that he needed "to get some weed." Smith then borrowed his sister's car, and he and Thomas went to pick up Pollard.

When Smith picked up Pollard, Guy was with him. Smith testified that when he was getting back in the car after stopping to get gas, Pollard was "on the phone with an Asian dude, and I was hearing him talking about how—about how much weed he was going to get and how much it was going to cost." Smith testified that while they were driving, he heard someone say, "We're going to get him. He—he got it. He got it. He got the kill." According to Smith, "kill" meant "he got a lot [of weed]."

As the foursome approached the Holyoke address, Pollard called "the Asian dude," who was already outside waiting for them. When the group arrived there was a woman and a little girl standing on the porch of the house, but they went inside when Pollard got out of the car.

Smith testified that he and Pollard went up to the house and went inside with the "Asian dude." Once inside, the "Asian dude" started weighing marijuana. Smith then saw Pollard pull out money and "right after that, I seen him pull out a gun." Pollard told the "Asian dude," "'Don't move,'" and asked, "'Where was the shit at.'" The man denied that there was any more marijuana. Smith testified that at that point, Pollard started moving toward the back hallway but kept his gun pointed at the man.

While Pollard was gone, Smith walked up to the man to see if there were any weapons around him. Smith did not see any, but he did not pat him down. According to

19

Smith, at about the same time, Thomas and Guy came into the house. Thomas "came in, and he had a gun. He cocked his gun, and then he walked over—they both walked in front of the Asian dude and asked him, where was the shit at." The man continued to deny that he had more drugs in the house.

After the denial, Thomas picked up a chair and hit the man with it. This led to a scuffle between the man and Thomas. Eventually Guy joined in, and Smith saw Guy and the "Asian dude" fighting over a gun.

"When they—they were still tussling, and his hand was in the air. And I was still standing by the door, whatever, and I seen the hand, like—like it was they were hand-to-hand trying to basically wrestle over the gun. And then I seen the hand coming towards, down—the Asian dude's hand coming down. And then when it came down, a shot got fired, and I got shot."

Smith testified that he fell to the ground after being shot. He then heard three or four more shots, got up, and ran to the car. He did not wait for any of the three others. He testified that he saw Pollard and Guy coming out of the door right after him and that both took off running. Thomas had run out of the back of the house.

At the end of Smith's direct examination, the State asked him, "How do people feel about gang members ratting on other gang members?" Smith answered, "They don't like it."

The State short-circuited Pollard's intended alibi defense by calling Pollard's grandmother and uncle, who lived in the same house, in its case in chief. The two witnesses' testimony established Pollard had been at the house just before the time of the shooting, had left, and then had returned later in the afternoon.

20

During the State's closing, the prosecutor discussed how the four codefendants came to be in league on the morning of the crimes.

"Defendant contacts gang kin; that's Dallas. Comes up with a plan. Defendant is going to set him up. Dallas is going to get a driver. Dallas reaches out to some other gang kin; and the one who contacts him back, Orville, O.T.[, h]e agrees to drive, and he brings along his pal, Dijon. That's how these four guys come together."

Before deliberations, the jury was provided with the following instruction on how to consider gang evidence:

"Evidence of defendant's documented gang status may be considered solely for the purpose of explaining how law enforcement identified the defendant as a suspect in this case and/or explaining the defendant's relationship with Orville Smith, Dijon Thomas, and Dallas Guy."

After the jury found Pollard guilty of both the first-degree murder of Khmabounheuang and the aggravated robbery of Wares, the judge sentenced Pollard to life in prison for the murder and a consecutive 100 months for the aggravated robbery.

PROSECUTORIAL ERROR

Pollard argues that the prosecutor erred by introducing gang affiliation evidence and misleading the district judge about the grounds for doing so. This claim is governed by *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016).

"In *Sherman* we recited the standard of review as a two-step process in which an appellate court must first decide whether a prosecutorial act complained of falls outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair

21

trial. 305 Kan. at 109. If that error is found, 'the appellate court must next determine whether [it] prejudiced the defendant's due process rights to a fair trial.' 305 Kan. at 109. And to do that, the court uses the constitutional harmlessness inquiry from *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). 305 Kan. at 109. Prosecutorial error is harmless if the State proves beyond a reasonable doubt the error will not or did not affect the trial's outcome in light of the entire record, *i.e.*, when there is no reasonable possibility the error contributed to the verdict. *Sherman*, 305 Kan. at 109." *State v. Love*, 305 Kan. 716, 728, 387 P.3d 820 (2017).

"Gang affiliation evidence is admissible if relevant." *State v. Peppers*, 294 Kan. 377, 386-87, 276 P.3d 148 (2012) (citing *State v. Brown*, 285 Kan. 261, 297, 173 P.3d 612 [2007]). And, in general, we apply the same rules for determining the relevance of gang affiliation evidence as we apply for any other type of evidence. See *Brown*, 285 Kan. at 297; see also K.S.A. 60-401(b). Gang affiliation evidence is not subject to the limitations of K.S.A. 2016 Supp. 60-455 on evidence of other crimes and civil wrongs. See *State v. Conway*, 284 Kan. 37, 159 P.3d 917 (2007) ("The legislature specifically limited the admissibility of evidence of crimes and civil wrongs in K.S.A. 60-455; no similar legislative statement exists with regard to evidence of gang affiliation."). "[G]ang evidence may be material and, therefore, relevant when the evidence provides a motive for an otherwise inexplicable act, forms a part of the events surrounding the commission of the crime, or shows witness bias." *State v. Goodson*, 281 Kan. 913, 923, 135 P.3d 1116 (2006). But this list of permissible uses of gang evidence is not exhaustive. *Peppers*, 294 Kan. at 389.

In order to structure this claim as prosecutorial error, Pollard asserts that the State misled the district judge about its basis for admission. In his view, neither the perpetrators' identity nor the relationship among the codefendants was in issue.

At the outset, we observe that the State's pretrial proffer of Stearns' anticipated testimony was completely consistent with how Stearns actually testified at trial. And, without Stearns' testimony, the State would not have been able to explain to jurors how Pollard came to be a suspect in this case.

Pollard attempts to undercut the relevance of this evidence by arguing that Pollard's identity and role in the crimes were established by other evidence, such as Wares' and Smith's identification of him. But the existence of other evidence tending to prove an aspect of the State's case does not take that aspect out of issue.

The State has the burden of proving every element of the crime charged. See *State v. Reser*, 244 Kan. 306, 309, 767 P.2d 1277 (1989) (expert testimony of characteristics exhibited by sexually abused children admissible even when defendant does not deny victim was sexually abused). Part of the State's burden is to prove not only that an unlawful act has been committed, but also that the defendant is the one who committed it. See, *e.g.*, *State v. Soto*, 299 Kan. 102, 110, 322 P.3d 334 (2014) ("the State was required to prove beyond a reasonable doubt that [*the defendant*] premeditated and intended Moreno's death and that [*the defendant*] either committed the physical acts that led to Moreno's death or facilitated another in committing those acts"). Moreover, as federal courts have recognized in the context of the federal rules of evidence, the relevance of a particular form of evidence is generally not "affected by the availability of alternative proofs of the element to which it went." *Old Chief v. United States*, 519 U.S. 172, 179, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997) (acknowledging exception to general rule for stipulation of defendant's prior conviction, when prior conviction element of crime); see also *State v. Lee*, 266 Kan. 804, 815, 977 P.2d 263 (1999) ("[T]he State has the right and, in fact the duty, to establish the elements of the crime charged. The State also has an interest in presenting its case in its own way by telling the story as the State wishes."), *State v. Arnold*, No. 111,520, 2015 WL 5613082 (Kan. App. 2015) (unpublished opinion)

23

("As a general rule, the State is entitled to use the full weight of its evidence to establish the elements of the crime for which the defendant is charged."), *rev. denied* 304 Kan. 1018 (2016).

Despite Pollard's claim otherwise, his identity was a central issue in the case. This was not a situation in which the defendant admitted to the underlying act but asserted an affirmative defense, such as self-defense. Although Smith and Wares identified Pollard as participating in the crime, Stearns' testimony explaining how Pollard became a suspect was necessary to corroborate Smith's and Wares' identifications. Moreover, it was necessary to provide context to demonstrate the thoroughness of the department's investigation and the soundness of its result. Stearns' testimony also helped to contradict Pollard's anticipated alibi defense.

Pollard also emphasizes Amyx's statement that she "would not classify this as a gang case." This effort to turn an isolated remark into something sinister is meritless. A full consideration of the motions hearing makes clear that Amyx merely intended to contrast the anticipated evidence in this case with expert testimony about details of specific gangs and gang culture. Here, Stearns merely used the department's gang database in the process of connecting Pollard to the crimes. The contrast was correct and helpful, not misleading.

Pollard's second argument on this issue—that "[t]he district court erred in its admission of the gang evidence and improperly prevented Mr. Pollard from making proper objections through a ruling of prior restraint"—is similarly unsuccessful.

Pollard believes that the district judge's warning to Cotton about opening the door to more expansive gang testimony violated his right to due process and that the judge's analogy to the DNA database was "absurd." We disagree. The judge acted wisely in

24

cautioning defense counsel about the peril of demanding additional evidence on the design and function of the gang database, including how the defendant came to be listed in it. Such evidence was likely to be much more prejudicial than that the judge ruled admissible. And it would have been similar to foundation evidence on the DNA database, which could include evidence of prior criminal conduct a defendant would not want a jury to hear.

Pollard's third argument on this issue is that the State repeatedly abused the gang evidence ruling by exceeding the parameters defined by the court. His appellate counsel characterizes Stearns' testimony as that of "a gang expert about street names and where they come from, how gang members communicate on social media, especially about the death of other gang members." But, again, full consideration of the record does not bear this out.

Stearns' brief references to these topics were tangential to his obvious and permissible point about the emergence of Pollard as a suspect. Stearns was giving strictly factual testimony, not expert opinions based on specialized knowledge or training about gangs or gang culture.

Pollard also complains that "Stearns commented on his prior contacts with all of the co-defendants and even specifically stated that the last time he had contact with Mr. Pollard, it was when Pollard was arrested on a warrant!" Stearns did mention that his contact with Pollard had been generated by Pollard's arrest on a warrant, but the information was not intentionally elicited by the State. In fact, the prosecutor interrupted Stearns when he strayed.

"Q. Based on that, you go back to your database.

25

"A. Correct.

"Q. And are you able to pull up a picture of Corey Pollard?

"A. Yes.

"Q. And that's what you mean by a recent photo?

"A. Yes. The particular contact that I recall, he was arrested for some warrant—

"Q. I'm only interested in—

"A. Okay. Yes.

"Q.—a photo.

"A. Yeah."

There was no defense objection at the time, and there is no indication that this passage in Stearns' testimony was part of a broader pattern of prosecutorial error, as Pollard's appellate counsel suggests. Although a prosecutor must inform its witnesses about the extent of any court orders that limit permissible testimony, see *State v. Santos-Vega*, 299 Kan. 11, 25-26, 321 P.3d 1 (2014), the prosecutor's immediate redirection of the witness fulfilled the State's obligation to minimize trial error.

Pollard also complains of the prosecutor's reference in closing to "gang kin." During trial, the State had admitted various text messages sent among the codefendants before the crimes. In some of the texts, the sender referred to the recipient as "kin." The prosecutor's borrowing of this terminology when explaining how the codefendants were connected to each other was not error. The judge had permitted gang evidence, in part, to explain the relationship of the codefendants.

26

Finally, Pollard argues that "[t]he haze of gang evidence permeated the State's case to such a degree as to render the limiting instruction moot." Pollard largely supports this argument with the same record passages that he used to establish error in the first place. Because Pollard's predicate allegations of error fail, his argument about the limiting instruction fails as well.

PRO SE MOTION FOR DISCOVERY

Pollard's second issue on appeal attacks the procedures employed by the court clerk's office in Sedgwick County for handling pro se motions in criminal cases. Pollard challenges the procedure both as it was employed in his case and as it is generally employed for other defendants.

The pro se motion in question sought to compel discovery. There is no indication in the record on appeal, and Pollard does not allege in his brief, that any discovery issue surfaced during trial. Nor does Pollard allege that the State failed to provide him with any discovery. Further, as Pollard acknowledges, he raises this issue for the first time on appeal.

Pollard's challenge to the procedure in other cases cannot be brought in his direct appeal. There simply is no record to support it. See *Southwestern Bell Tel. Co. v. Beachner Constr. Co.*, 289 Kan. 1262, 1275, 221 P.3d 588 (2009) (burden on party to designate record sufficient to present its points to appellate court to establish its claims is well-settled). Other than the letter from the clerk to Cotton stating how Pollard's pro se motion would be handled, there is nothing before us. Pollard claims that the system has been in place for approximately 2 years and claims that other pro se motions are handled in the same manner as his was. He also alleges that the "matter of the propriety of this

27

system has been discussed with the local chief judge, criminal assignment judge, and clerk of the district court; and no changes have been made." None of these allegations can be confirmed or refuted. Moreover, Pollard's allegations at different points in his brief leave conflicting impressions. At one point, he states, "Pro se motions that challenge the effective assistance of counsel or a constitutional issue are usually scheduled for hearing automatically by the clerk. All other pro se motions are handled in the [same manner as Pollard's motion]." But, on the next page, he states, "The Clerk's file-stamping a pro se motion but taking no further action except notifying the defense attorney is now a systemic issue and the same procedure has been used numerous times and has included *pro se* motions complaining about ineffective assistance and violations of constitutional rights."

This problem—the absence of a record—also dooms Pollard's challenge, even as applied to him alone.

Pollard asks this court to remand his case for a hearing "regarding the deprivation of Mr. Pollard's rights based on a systemic violation of the rights of all criminal defendants who file pro se motions in Sedgwick County and determine that the ongoing blockade of defendants' right of access to the court warrants a reversal of Mr. Pollard's convictions." This is a non sequitur. Whether others' rights to motion hearings have been infringed in their own cases has no logical connection to whether Pollard's right to a hearing on his pro se motion was violated here or to whether Pollard is entitled to a remand.

Even if we were inclined to criticize the procedure used in this case, which, on this thin record, we are not, see *State v. Holmes*, 278 Kan. 603, 620, 102 P.3d 406 (2004) (within judge's discretion to allow defendant self-representation after counsel appointed), Pollard fails to establish that he was in any way prejudiced by having his motion referred

28

to Cotton rather than heard on its own. The motion simply sought to compel the State to turn over discovery. At the time Pollard filed it, the district judge had already ordered the State to comply with state statutory law and caselaw on discovery. Before trial, the parties agreed that each had provided the other with all relevant discovery, and the judge acknowledged that the parties had so agreed. At trial, no issue about discovery, or lack thereof, ever came up. Simply put, even though Pollard's motion was never explicitly ruled on, he was denied no meaningful access to the court. The substance of the motion was achieved.

CONCLUSION

Defendant Corey Pollard's claims of prosecutorial error based on gang evidence and of denial of due process based on handling his pro se motion to compel are without merit. We affirm the judgment of the district court.